R. E. HARRINGTON, INC., Plaintiff, v. WINDMILLER, Defendant.

Municipal Court, Columbus.

No. 119810. Decided September 6, 1961.

564

*Mr. Robert E. Hoffman,* for plaintiff.
*Mr. Owen E. Sherwood,* for defendant.

TROOP, J. This cause is on to be decided upon the motion of counsel for the defendant to dismiss plaintiff's petition and upon the motion of counsel for the plaintiff to amend his first and second causes of action to conform to the evidence amending the prayers to the causes to read in the amount of $479.27 and $903.61 respectively. Counsel for the defendant objected to the motion to amend the prayers on the ground that plaintiff had already rested his case. The case was submitted at this point upon the pleadings, the evidence, and the motions.

The court finds that plaintiff and defendant are parties to two contracts identified as plaintiff's Exhibits 1 and 2. Both contracts are dated April 9, 1958, for terms from May 1, 1958, to May 1, 1959, renewable automatically for additional one year terms unless written notice is given by either party sixty days prior to expiration of an intention not to renew. Contract numbered one is one in which plaintiff agrees to act as con-

sultant to the defendant in matters dealing with the Bureau of Unemployment Compensation, and contract numbered two is similar except that the matters pertain to the Industrial Commission of Ohio. A schedule of fees due plaintiff from defendant for services rendered is contained in the contracts.

Further, the court finds that defendant notified plaintiff of his intention to terminate the contracts in September of 1960, and, although defendant did not co-operate with plaintiff in the sending of reports and notices after June of 1960, the plaintiff performed some services for the defendant, including the attendance at hearings, as a representative of the defendant, of both the Bureaus of Unemployment Compensation and Workmen's Compensation, and the filing of protests and complaints on behalf of defendant to both bureaus, up until September of 1960.

Basic facts in the instant case are essentially without dispute. The court is confronted primarily with questions of law. The final arguments of counsel point up the questions to be decided. Let us address ourselves to the lesser questions first. Counsel for defendant argue that the plaintiff could not amend the prayers of its petition after it had rested its case. Motions such as this are addressed to the sound discretion of the court. So long as the court by its rulings endeavors to promote essential justice, it cannot be charged with an abuse of discretion. This court holds that the motion is proper. The motion to amend the prayers is sustained, and the petition of the plaintiff shall be so amended.

Defendant also contends that the plaintiff has failed to prove its corporate capacity and has, therefore, failed to sustain an essential element of its case. The rule of law to be applied is announced in *Brady* v. *The National Supply Company*, 64 Ohio St., 267. It reads as follows:

"1. Where a corporation commences an action, it need not aver in its petition that it is a corporation; and if such averment is made, it will be held to be immaterial and mere surplusage, and a general denial to a petition containing such averment will not impose upon the plaintiff the burden of proving on the trial that it is such corporation."

Defendant addressed only a general denial to the plain-

tiff's averment of corporate capacity. Proof of such corporate character was unnecessary at the time of trial.

Counsel for defendant makes some argument that the contracts in issue are without consideration because defendant was required by law to make reports to the two bureaus to which the contracts refer and such fact destroys the enforceability, if not the legality, of those contracts. But the essence of this dispute lies in the quotation counsel offered from *Public Service Traffic Bureau* v. *Haworth Marble Co.*, 40 Ohio App., 255, quoted as follows:

"* * * any contract entered into between a corporation and others contemplating the practice of law * * * in any phase whatsoever is void as against public policy."

Counsel for plaintiff objected to the argument contending that such a defense is affirmative and must be pleaded, which defendant has not done, and the issue could not, therefore, be before the court.

It would appear that counsel for the defendant is correct in his claim that illegality need not be pleaded as an affirmative defense. The rule is set out in 11 Ohio Jurisprudence (2d), 371, Section 125. It reads:

"If a contract appears to the court to be illegal it should not be enforced even though its validity is not challenged by either party."

And, in further support, 43 Ohio Jurisprudence (2d), 154, Section 138, says:

"Nor is it necessary to plead objection to a contract by its terms contra bonos mores, for a court will of its own accord refuse to entertain an action on such a contract."

And there it is, the meat of the issue before this court to decide. The parties herein entered into two contracts, both of which have been breached by the defendant, and for which breach the plaintiff is entitled to damages if the two contracts, described as plaintiff's Exhibits 1 and 2, are legal and enforceable. If they are not legal, or, to say it differently, if they are opposed to public policy, then they are not enforceable and the plaintiff is not entitled to a recovery for the alleged breach. Concerning illegality as a defense, see 11 Ohio Jurisprudence (2d), 370, Section 125, a part of which reads as follows:

"The fact that parties are in pari delicto does not prevent the setting up of the illegality as a defense to an action on the contract. Recovery upon an illegal contract will be denied whenever and however the illegality of the contract is made to appear."

Further, 11 Ohio Jurisprudence (2d), 340, Section 103, is more specific and reads, in part, as follows:

"The courts have held a variety of contracts invalid on the ground of public policy, namely, among others, * * *, contracts involving the unauthorized practice of law * * *."

The footnote supporting the above proposition refers to the case of *The Public Service Traffic Bureau, Inc., v. Haworth Marble Co.,* 40 Ohio App., 255. Several paragraphs of the syllabus of the *Haworth case* should be noted. They are as follows:

"4. Corporations could not recover for services rendered under contract to practice law, notwithstanding services did not constitute practice of law.

"5. Contract whereby corporation was to analyze defendant's freight bills and 'prosecute' claims thereon, fees depending largely on 'recoveries,' held void as contract for 'practice of law.'"

We shall look carefully at the contracts involved, the testimony elicited concerning them, and the case law dealing with similar activities to resolve the essential issue presented to this court. The one paramount issue is the determination as to whether the plaintiff, a corporation, contracted to engage in the unauthorized practice of law when it became a party to the contracts identified as plaintiff's Exhibits 1 and 2.

Particular attention is directed to some of the items plaintiff, as "consultants," agree in contract, Exhibit 1, to do for the defendant. They follow:

"5. Attend and represent the Employer at all hearings before the Bureau or before the Board of Review and its referees, at the request of the Employer;

"6. Advise the Employer of any statutory changes, or changes in rules and regulations of the Bureau of Unemployment Compensation;

"7. Take all necessary steps to procure and maintain the

best possible Unemployment Compensation merit rate for Employer.''

And, likewise, in contract, Exhibit 2, plaintiff agrees as follows to:

''5. Attend and represent the Employer at all hearings before the Industrial Commission of Ohio at the written request of the Employer;

''6. Advise the Employer of any statutory changes, or changes in rules and regulations of the Industrial Commission of Ohio;

''7. Take all necessary steps to procure and maintain the best possible modification of the Employer's rate at the Industrial Commission of Ohio; and all of the above to be done in compliance with the rules and regulations of the Industrial Commission of Ohio.''

At the time of trial, a witness for the plaintiff, Leroy C. Marx, testified that the plaintiff company had performed all the services required to be done under the contracts and stood ready, willing and able, at all times, to perform fully, but was prevented by the unwillingness of the defendant to co-operate. Particularly, the witness said that he had attended hearings on unemployment and workmen's compensation claims, advised the defendant on hiring and separation methods, and discussed the service plaintiff rendered with the new manager employed by the defendant. Marx testified further that he did not have a complete record of the hearings attended or the claims reviewed or the actuarial reports made.

In order that there be no mistake as to certain testimony, some small portions are set out here. Counsel for defendant, Mr. Sherwood, cross-examined Mr. Marx. The questions and answers are as follows:

''Q. I notice in the petition that nothing is said about the representation of my client in the hearings before the Bureau of Unemploymet and the Workmen's Compensation Bureau. Did you represent him in any hearings before either one of these bureaus, Mr. Marx? A. Did we?

''Q. Yes. A. During the course of our services with Mr. Windmiller I have had occasion to go into Unemployment Hearings and represent him. I know of occasions when Mr.

Gibson, of our office, it was necessary to represent this company on Workmen's Compensation matters. So I do know that there were hearings held and I do know that we were in attendance according to our contract.

"Q. Did you win any of those cases that you represented him on? A. I wouldn't be able to tell you at this point whether the decision was in Mr. Windmiller's favor or in the claimant's favor. I do not have the daily records with me.

"Q. As a matter of fact, you didn't win any of those cases did you, Mr. Marx? A. Again I tell you I could not tell you at this point whether we did or whether we didn't. That is, not in itself. We do not hold ourselves out to win any cases. According to our contract, we will give proper representation, which we do, and which we did."

And, respecting the contracts, counsel for defendant asked questions and received answers as follows:

"Q. And the agreement that you have my client and other clients sign is for the purpose of obtaining the best possible merit rating or the reduction of the client's merit rating in both of these bureaus, isn't that true? A. Our efforts are directed toward the control of the factors that make up merit rating on Unemployment and Workmen's Compensation.

"Q. And these factors include the defense of cases in behalf of the employer? A. Yes, sir; as the rules and regulations allow."

Then followed redirect examination by counsel for the plaintiff to develop particular cases and the presence of the witness, Marx, at hearings on unemployment matters. The questions and answers follow:

"Q. Now, you may, to shorten this up, you may, with the court's permission, count the number of files there that you processed and which would assist in reflection of this rating? A. Can I refer to specific cases?

"Q. Yes, I think that would be better. A. Here is the case of Peter Berry, Docket No. 266580.

"Q. Just give the name. A. Issued under date of July 22, 1959, decision in part, dismissed at request of reconsidering of the claim on the grounds not properly filed within the time limit. We attended the hearing with—I attended the

hearing with a representative of the company. Here's a direct one hundred fifty-two dollar savings as a result of a letter sent on Nov. 27, 1959, in the claim of Ada Ruth Fox. Hearing was held. I attended. Decision is dated June 26, 1959, which the claimant was told that she was not able and available for suitable work for time and period involved. Appears here is another decision on the same claimant, date Feb. 17, 1959, in which there was seventy-three dollars savings. Here's the same claimant, decision dated October 15, '58, in which the worker was told she was not entitled to one hundred forty-six dollars which was credited back to the employer's account. Here's one on the claimant, Emma Hall, decision dated Sept. 8, 1959, fifty-four dollars. Here's one dated June 29, same claimant, decision reversed and the employer's account credited twenty-seven dollars, direct result of our services. Here's another one for twenty-seven dollars, decision dated March 15, 1959.''

Some testimony deals with hearings before the Industrial Commission. Counsel for plaintiff on the direct examination of James F. Gibson, an employee of plaintiff corporation, directed questions and elicited answers as follows:

''Q. Will you, please turn to that and see how many hearings you attended or somebody attended on behalf of Emil Windmiller from Dec. 31, 1959? A. Feb. 17, 1960, hearing was attended on case of Lavaughn Johnson before the Industrial Commission on a question of percent of permanent-partial disability. March 30, 1960, a hearing was attended before the Industrial Commission on the case of Alma Bedner on the question of permanent-partial disability. June 7, 1960, attended a hearing before the Referee of the Bureau of Workmen's Compensation on the question of allowance on claim of Richard Simpson. On Aug. 25, '60, hearing before the Commission on a Betty Snyder on a motion that was filed by her. On Sept. 14, '60, there was a hearing set on a question of settlement on a Lavaughn Johnson and we got notice of the hearing. I attended it and there was another representative there for him.

''Q. You were there, however? A. I was at the hearing, yes. I didn't go to the hearing itself. After he had another

representative there, I did not stay. I talked to his other representative about it.

"On Sept. 28, '60, there was a hearing on Isaac Andrews on permanent-partial disability and the same situation was there."

That it is the function of the courts to determine what is unauthorized practice seems to be a well supported rule. As we examine the contracts here involved and the testimony given at the trial for the purpose of resolving the major issue, we conclude that published decisions clearly support the right of the courts alone to define what constitutes the practice of law and that right persists regardless of any rule or policy announced or followed by any administrative agency. In *In re Unauthorized Practice of Law in Lucas County* (Common Pleas Court), 73 Ohio Laws Abs., 343, paragraph one of the headnotes reads:

"It is not within the power of a Bureau or of the Legislature to say and define what actions and conduct constitute the practice of law in Ohio; such power resting solely with the Courts."

The rule is reiterated in *Special Master Commissioners* v. *McCahan* (Common Pleas Court), 83 Ohio Law Abs., 1, paragraph eight of the headnotes reads:

"It is not within the power of a bureau or of the General Assembly to say and define what actions and conduct constitute the practice of law in Ohio; it is solely within the power of the courts to say what actions and conduct constitutes such practice."

Our own Franklin County Common Pleas Court approved that proposition in *Battelle Memorial Institute* v. *Green*, 84 Ohio Law Abs., 353. The fifth paragraph of the headnotes reads as follows:

"The power to regulate, control and define the practice of law rests inherently in the judicial branch of the government."

And now to examine the contracts, the evidence, and the law, as found in the available cases, to determine whether the contracts sought to be enforced in this action provide for the rendering of a service, by a corporation, which is in fact the practice of law. The contracts here involved provide for service in connection with two state administrative agencies,

the Bureau of Unemployment Compensation, and the Bureau of Workmen's Compensation or the Industrial Commission.

The fifth paragraph of the headnotes of the *Battelle case* (84 Ohio Law Abs., 353) is slightly bothersome. It reads:

"The work done before an administrative agency may or may not constitute the practice of law but if it does constitute the practice of law, and is done in Ohio, it must be done by persons who are duly licensed to practice law in Ohio."

The contracts here refer to the plaintiff as "consultants." The testimony identifies it as actuarial "consultants." It seems clear that the actuarial science is in no sense the practice of law. Actuaries have been described as those skilled in theories of mathematical problems. They are commonly found active in the insurance business where they engage in the calculation of risks and premiums. Since risk is a factor in both unemployment and workmen's compensation, it would appear that there is a perfectly proper place for the exercise of the training and skill of the actuary. If the calculations of the two bureaus were checked, respecting reserve requirements, premium contributions (or payroll tax contributions, if you will), and merit ratings, and a determination made as to accuracy and proper applicability of these strictly mathematical matters, then the actuary is operating within his proper sphere.

The contracts, the subjects of our scrutiny, provide that the plaintiff will "attend and represent the employer at all hearings," "advise the employer of any statutory changes," and "take all necessary steps to procure and maintain the best possible modification of the employer's rate." Witnesses Marx and Gibson, a portion of the testimony being set out above, both testified that they attended hearings on behalf of the defendant employer. Marx said that the claims of certain persons were disallowed following the hearings. Gibson said that he had attended a hearing on behalf of the defendant when a question of a permanent-partial disability award to one Levaughn Johnson was reviewed.

Hearings such as those recited in the record are essentially adversary proceedings. If an employee of the plaintiff corporation were present to represent the defendant, it is inconceivable that his presence was characterized by stony and abject

silence. If he were there to represent he must oppose the granting of the claims under consideration. In fact, he is obliged by Item 7 of plaintiff's (his employer) contract with the defendant to do everything he can to reduce defendant's rate, and one very effective way to reduce it is to promote the disallowance of claims. To accomplish the ultimate reduction in cost to the defendant, the plaintiff must advise defendant as to what claims to oppose, unless of course the plaintiff follows what is a common but inexcusable practice of filing a protest against every claim filed for unemployment benefits by a former employee of his client. But even so, appearance at hearings means the critical examination of claimants and the consequent necessity of advising the defendant employer what to do next. Mr. Marx summarized the results of a number of hearings which he attended which resulted in the disallowance of claims.

Representation by the plaintiff on behalf of the defendant at hearings in which witnesses and claimants appeared for examination and cross-examination and in which the interpretation and application of the law to specific instances and particular people was necessary goes far beyond the scope of one skilled in mathematical theories. In the present processes, before both the bureaus mentioned, the claimant is opposed to an employer. Their interests are conflicting, and those who represent the parties must of necessity be advocates and know the law and advise those whom they represent of their rights under the law. Such is precisely what the plaintiff herein purports to do in the language quoted from the contracts as set out above.

It is true that the hearings by the various arms of administrative bodies, in particular the two here involved, are somewhat informal and the technical rules of evidence do not apply. Nevertheless, the boards and their representatives base their decisions on competent evidence and the law, and the record of the proceedings at the hearings becomes the basis of appeal as they take the form of a certified transcript.

The court in the so-called *Bailey case* (73 Ohio Law Abs., 343), found many facts to be important to its decision. Its finding of facts begins on page 345 of 73 Ohio Law Abstract. The court held that all the actions set forth in its finding of facts,

except two, constituted the practice of law. Pertinent findings, found to be the practice of law, as found on page 346, follow:

"3. He attended hearings before the Referees and examined and cross-examined the claimants and witnesses.

"7. He interpreted the law and the Rules and Regulations of the Bureau for his clients.

"8. He prepared and filed appeals and notices of appeals on behalf of his clients.

"9. He participated in all proceedings before the Board * * * his actions during such proceedings, including examination of the original claim when it is filed, the preparation and filing of a protest, appearances at the hearing and participation in the hearing by the examination and cross-examination of the claimant and witnesses. * * *."

Plaintiff herein, by the testimony of its employees, admitted having attended hearings, and of necessity to have a hearing on an unemployment compensation claim a protest must have been filed; and to have secured the disallowance of a claim a claimant's story had to be discredited by cross-examination or by the interrogation of witnesses.

The case of *Special Master Commissioners* v. *McCahan, supra* (83 Ohio Law Abs., 1), is concerned with practice before the Industrial Commission or the Bureau of Workmen's Compensation. Judge Rosetti of the Stark County Court of Common Pleas has written a very able opinion in which he reviews in considerable detail the procedures before the commission. At page nine, the court has detailed important points in the procedure.

In the finding of facts as to services performed, on page 6, we find item numbered 12, which reads as follows:

"He attended hearings before the Administrator, presented facts, discussed disability, propounded questions, advanced arguments, in order to establish the compensability of claims."

In our case, the witness Gibson said that:

"February 17, 1960, hearing was attended on case of Lavaughn Johnson before the Industrial Commission on a question of percent of permanent-partial disability; March 30, 1960, a hearing was attended before the Industrial Commission on the case of Alma Bedner on the question of permanent-partial disability."

Again, are we to assume he merely "attended"? If that is all he did then he did not "take all necessary steps to procure and maintain the best possible modification of the employer's rate." To defeat or reduce the amount of claims filed is a most effective way to improve the employer's merit rating.

Another phase of the service rendered to the defendant by the plaintiff moves closer to the practice of the actuarial science. The testimony of the witness Taylor, an employee of the plaintiff corporation, indicates that the rates charged the defendant were examined by Taylor, who described himself as an actuary for the plaintiff. He testified that the rates charged defendant had been reduced at various times. A specific question and answer is as follows:

"Q. Do you know how those rates were reduced? A. We protested the rate to the actuarial section."

This is another illustration of the actuary going beyond his proper sphere and into the practice of law. Paragraph nine of the headnotes in *Special Master Commissioners* v. *McCahan, supra* (83 Ohio Law Abs., 1), with our emphasis reads as follows:

"The use of knowledge of the Workmen's Compensation Law and decisions required to prepare applications and papers pertaining to that law, in such a way that valuable rights would not be lost, and the giving of advice to clients *and all action taken for them in matters connected with the Workmen's Compensation Law*, whether or not a fee is charged, constitutes the practice of law in Ohio."

To the extent that the services of the plaintiff consisted of the auditing of rates, classifications, and charges and credits to reserve accounts, they fall within the realm of the actuary. It is conceivable that simply advising the proper bureau representative of an error discovered in the auditing process is appropriate to the work of the actuary. As soon, however, as the actuary files a protest under the law or becomes a party to and participates in the adversary proceedings between claimant and employer in an attempt to secure the reduction or disallowance of a claim, he becomes an advocate and has lost his connection entirely with mathematical theory. However liberal we may be in defining the processes followed before the two

bureaus before us, those processes cannot be regarded as merely the filing of claims for benefits. The processes now are adversary, particularly in the area of workmen's compensation, and the employer's costs cannot be limited by a better method than by successfully securing the disallowance of claims.

The plaintiff herein, a corporation, contracted to appear at hearings and did appear at hearings on behalf of the defendant. The plaintiff contracted to procure and maintain the lowest possible rates for the defendant, and by the filing of protests and opposing the claimants at hearings and protesting rates to the Industrial Commission affected rate reductions. It is this court's considered opinion, after careful examination of the so called *Bailey case*, the *McCahan case*, the *Battelle case,* and the *Haworth case*, that such activity and service constitutes the unauthorized practice of law by the plaintiff corporation.

Some of the service rendered was actuarial, but much more of it was the practice of law. No division can be, nor need be, made in the light of the rule set out in the fourth paragraph of the syllabus 3 of the *Haworth case*. It reads as follows:

"Corporations could not recover for services rendered under contract to practice law, notwithstanding services did not constitute practice of law."

The contracts here sought to be enforced are contracts in which the plaintiff corporation engages to perform services which are in fact the practice of law. Such contracts are opposed to public policy and, therefore, unenforceable.

The petition of the plaintiff as amended is dismissed at plaintiff's costs.

Petition dismissed.